UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HENRY C. BLAUFOX, On Behalf of Himself and All Others Similarly Situated and Derivatively on Behalf of KEANE, INC., | ) ) ) ) | No.<br><br>CLASS AND DERIVATIVE ACTION |
| Plaintiff, | ) ) | COMPLAINT |
| vs. | ) ) ) | |
| JOHN F. KEANE, SR., BRIAN T. KEANE, JOHN F. KEANE, JR., JOHN J. LEAHY, ROBERT B. ATWELL, RUSSELL J. CAMPANELLO, RAYMOND W. PARIS, WALLACE A. CATALDO, RENEE SOUTHARD, JAMES D. WHITE, LAWRENCE P. BEGLEY, MARIA A. CIRINO, PHILIP J. HARKINS, JOHN F. ROCKART, KIRK E. ARNOLD, JOHN H. FAIN and WINSTON R. HINDLE, JR., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| KEANE, INC., a Massachusetts corporation, | ) ) | |
| Nominal Party. | ) ) ) | DEMAND FOR JURY TRIAL |

**NATURE OF THE ACTION**

1.      This is a stockholder class action brought by plaintiff on behalf of the holders of

Keane, Inc. ("Keane" or the "Company") common stock against Keane's directors arising out of

their attempts to provide certain Keane insiders and directors with preferential treatment in

connection with their efforts to complete the sale of Keane to Caritor, Inc. (the "Acquisition").  This

is also a shareholder derivative action brought on behalf of the Company against current and former

officers and directors.  The derivative claims seek to remedy defendants' violations of federal and

state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste,

unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of

business whereby defendants allowed senior Keane insiders to divert hundreds of millions of dollars

of corporate assets to themselves via the manipulation of grant dates associated with hundreds of

thousands of stock options granted to Keane insiders.  Each of the defendants also participated in the

concealment of the backdating option scheme complained of herein and/or refused to take advantage

of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in

illicitly obtained incentive compensation and proceeds diverted to them since at least 1995.  This

action seeks equitable relief only to the extent the claims relate to the Class claim.

2.      Keane provides information technology and business process services through an

integrated network of regional offices in North America, the United Kingdom, and Australia and

through advanced development centers in the United States, Canada, and India.  Keane was founded

in 1965 and is headquartered in Boston, Massachusetts.

3.      Several events occurred in 2006 that spurred defendants to seek out the Acquisition

with Caritor.  First, in May 2006, the Company was rocked by a sexual harassment scandal involving

its then-President and Chief Executive Officer ("CEO"), defendant Brian T. Keane ("Brian Keane"),

which ultimately forced him to resign.  Within one week of this news, a second accuser came

forward with similar claims against defendant Brian Keane.  As a result of defendant Brian Keane's resignation, the Board was forced to expend substantial effort in a six month nationwide search to find a suitable replacement.  In addition, the Company was forced to pay more than $1.4 million to settle the two accusers' sexual harassment allegations against defendant Brian Keane.  Despite causing this turmoil, defendant Brian Keane was permitted to remain as a paid "consultant" to the Company, earning $26,000 per month.  These developments had a substantial negative impact on the Company's stock price.

4.       Barely recovering from the sexual harassment scandal, the Company was forced to announce in September 2006 that it had fired yet another top executive for "just cause" relating to unspecified travel expenses and unauthorized communications which "had the potential to be very damaging to the company and its shareholders."  Amidst news of the executive scandals, the Company also reported lower than expected revenues for the third quarter 2006.  Again, the Company's stock price plummeted.

5.       Meanwhile, in recent months, over 100 companies have come under scrutiny for their stock option granting practices.  On March 18, 2006, an article appeared in *The Wall Street Journal* entitled "The Perfect Payday – Some CEOs reap millions by landing stock options when they are most valuable; Luck – or something else?"  *The Wall Street Journal*'s analysis focused on financial filings from several companies and was an extension of recent academic articles which suggested that "backdating [stock options] was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002."

6.       This announcement and the subsequent development of the stock option backdating scandal sent another shockwave through defendants because, from 1995 until 2002, defendants had repeatedly engaged in the improper practice of backdating stock options to the dates of quarterly

and/or annual lows in the Company's stock price, and/or had timed stock grants to coincide with, and take advantage of, the release of positive news (and the corresponding lift that news had on the Company's stock). ***Indeed, on three separate occasions, defendants dated Keane's stock option grants at the lowest closing price of the year and on two other occasions dated the grants at the second lowest closing price of the year.*** By doing so, defendants were able to ensure tens of millions of dollars in illicit stock option profits for themselves and/or other Company insiders, while at the same time causing tens of millions of dollars in harm to the Company.

7.     Between 1995 and 2006, defendants also caused Keane to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by Keane carried with them an exercise price that was ***not less than*** the fair market value of Keane stock on the date of grant and issuance.

8.     In fact, defendants were aware that the practices employed by the Board allowed the stock option grants to be ***backdated*** to dates when the Company's shares were trading at or near the lowest price for that relevant period. By December 2006, defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars. These grants were included in more than $35.5 million in stock sale proceeds for defendants.

9.     Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Massachusetts law. By authorizing and/or acquiescing in the stock option backdating scheme, defendants: (i) caused Keane to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior Keane executives; and (iii) subjected Keane to potential liability from regulators, including the SEC and the IRS.

10.     Defendants' gross mismanagement and malfeasance over the past decade has exposed Keane and its senior executives to criminal and civil liability for issuing false and misleading financial statements.  Specifically, defendants caused or allowed Keane to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of Keane's earnings and earnings per share.

11.     Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on Keane.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations as to void all grants made pursuant to the plans.  Meanwhile, certain of the defendants, who received under-priced stock options and/or knew material non-public information regarding Keane's internal control problems, abused their fiduciary relationship with the Company by selling over $35.5 million worth of their personally held shares at artificially inflated prices during the relevant period.  Accordingly, this action seeks recovery for Keane against these faithless fiduciaries, as Keane's Board of Directors, as currently composed, is simply unable or unwilling to do so.

12.     As publicity surrounding the stock option backdating scandal grew and as more companies came under scrutiny for their stock option granting practices, defendants knew that it was only a matter of time until Keane would become the target of such scrutiny and that defendants'

prior misconduct would be revealed, subjecting them to potential civil and criminal liability for their past misdeeds.

13.     After enduring more than six months of scandal and turmoil, the Company announced on January 22, 2007, that it had finally found a new CEO, defendant Kirk Arnold.  Excited by news of a new CEO, shareholders were eagerly anticipating the Company's fourth quarter and fiscal 2006 results.  On February 5, 2007, the Company announced it would hold a conference call announcing those results on February 14, 2007.

14.     Defendants barely allowed shareholders enough time to digest the news of the Company's new CEO and news of the Company's soon-to-be released financial results before pulling the rug out from under those shareholders by announcing on February 7, 2007, that defendants – in a move designed to give the Keane family liquidity for their substantial and highly illiquid block of Company stock and further to provide defendants with indemnification for their prior misconduct – had entered into an agreement to sell the Company to Caritor.

15.     In pursuing the unlawful plan to sell Keane, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing.

16.     In fact, instead of attempting to obtain the highest price reasonably available for Keane for its shareholders, the defendants spent substantial effort tailoring the structural terms of the Acquisition to meet the specific needs of the individual defendants, especially John F. Keane, Sr., John F. Keane, Jr. and Brian Keane, who control an otherwise illiquid 11.6 million shares of the Company's stock, and Caritor.

17.     Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's shareholders.  Plaintiff, on behalf of the Class, seeks to level the

playing field and to ensure that if shareholders are to be ultimately stripped of their respective equity interests in the Acquisition, the Acquisition is conducted via a fair process that is designed to, and does, obtain a fair price for the Company's public shareholders.

18.     In essence, the proposed Acquisition is the product of a hopelessly flawed process that was designed to ensure the sale of Keane to one buying group, and one buying group only, on terms preferential to Caritor and defendants, and to subvert the interests of the plaintiff and the other public shareholders.

## JURISDICTION AND VENUE

19.     The derivative claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  The class claims arise under state law.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

20.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

21.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

22.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  The acts charged herein occurred in substantial part in this District.  Keane is located in and conducts its business in this District.  Further, one or more of the defendants either resides in or maintains executive offices in this District.

## PARTIES

23.     Plaintiff Henry C. Blaufox is, and at all times relevant hereto was, a shareholder of Keane.

24.     Nominal party Keane is a Massachusetts corporation with its principal executive offices located at 100 City Square, Boston, Massachusetts.  Keane is one of the world's leading providers of business and IT services.

25.     Defendant John F. Keane, Sr. ("John Keane, Sr.") is the founder of the Company and has served as Chairman of the Board of Directors of the Company since the Company's incorporation in March 1967.  From 1967 to November 1999, John Keane, Sr. served as President and CEO of the Company.  John Keane, Sr. is the father of Brian Keane, the former President, CEO and a director of the Company, and John F. Keane, Jr., a director of the Company.  Because of John Keane, Sr.'s positions, he knew non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, John Keane, Sr. participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

26.     Defendant Brian Keane joined the Company in 1986 and served as President and CEO of the Company from November 1999 until 2006 and as a director of the Company since May 1998 until 2006.  He presently is a paid consultant of the Company.  From 1990-1999, Brian Keane held various executive positions at the Company, including Executive Vice President and Senior Vice President.  Brian Keane is the son of John Keane, Sr., the founder and Chairman of the Board of Directors of the Company, and the brother of John F. Keane, Jr., a director of the Company.

Because of Brian Keane's positions, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Brian Keane participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Brian Keane sold 161,200 shares of Keane stock for proceeds of over $7.7 million during the relevant period

27.     Defendant John F. Keane, Jr. ("John Keane, Jr.") has served as a director of the Company since May 1998. John Keane, Jr. was the founder of ArcStream Solutions, Inc. ("ArcStream"), a consulting and systems integration firm focused on mobile and wireless solutions, and was its President and CEO from July 2000 until April 2005. The Company acquired certain assets of Arcstream in April 2005. From 1990-2000, John Keane, Jr. held various executive positions at the Company, including Executive Vice President and Senior Vice President. John Keane, Jr. is the brother of Brian Keane, the President, CEO and a director of the Company, and the son of John Keane, Sr., the founder and Chairman of the Board of Directors of the Company. Because of John Keane, Jr.'s positions, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, John Keane, Jr. participated in the issuance of false and/or misleading statements, including the

preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant John Keane, Jr. sold 88,587 shares of Keane stock for proceeds of $1.8 million during the relevant period

28.     Defendant John J. Leahy ("Leahy") has served as Chief Financial Officer ("CFO") of the Company since joining in August 1999, and as Executive Vice President of Finance and Administration since 2005.  Recently, Leahy also served in the position of Interim President and CEO from May 2006 until January 2007.  Leahy additionally served as Senior Vice President of Finance and Administration from August 1999 until his promotion to Executive Vice President. Because of Leahy's positions, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, Leahy participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Leahy sold 32,508 shares of Keane stock for proceeds of $406,328 during the relevant period.

29.     Defendant Robert B. Atwell ("Atwell") has served as Senior Vice President since 1999.  Atwell joined Keane in 1974 and served in various positions through 1986.  Atwell left the Company in 1986 and returned in 1991, serving in various capacities until his promotion to his current position in 1999.  Because of Atwell's positions, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Atwell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Atwell sold 55,400 shares of Keane stock for proceeds of $878,399 during the relevant period.

30.     Defendant Russell J. Campanello ("Campanello") has served as Senior Vice President, Human Resources since September 2003. Because of Campanello's position, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Campanello participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Campanello sold 7,875 shares of Keane stock for proceeds of $94,897 during the relevant period.

31.     Defendant Raymond W. Paris ("Paris") has served as Senior Vice President of Healthcare Solutions of Keane since January 2000. Paris joined the Company in November 1976 and has served in various management and executive roles until his promotion to his current position. Because of Paris's position, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided

to him in connection therewith.  During the relevant period, Paris participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Paris sold 294,200 shares of Keane stock for proceeds of over $5.4 million during the relevant period.

32.    Defendant Wallace A. Cataldo ("Cataldo") served as the Vice President, Finance and Administration from October 1985 until he retired in August 2000.  Cataldo joined the Company in June 1975, serving as CFO from November 1983 to October 1985 and as Controller from November 1978 to November 1983.  Because of Cataldo's positions, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, Cataldo participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Cataldo sold 90,000 shares of Keane stock for proceeds of nearly $3.0 million during the relevant period.

33.    Defendant Renee Southard ("Southard") served as Senior Vice President, Human Resources, of Keane from December 1999 to July 2002.  Thereafter, Southard was appointed to the newly created position of Vice President of Integration.  Southard joined the Company in July 1983, and served in various managerial positions within the Human Resource department until she was promoted in December 1995 to Vice President, Human Resources, serving in this capacity until her promotion in December 1999.  Because of Southard's positions, she knew the adverse non-public

information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith.  During the relevant period, Southard participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on her knowledge of material non-public information regarding the Company, defendant Southard sold 2,200 shares of Keane stock for proceeds of $121,000 during the relevant period.

34.    Defendant James D. White ("White") has served as a director of the Company since February 2004.  Because of White's position, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Nominating and Corporate Governance Committee, defendant White caused or allowed the dissemination of the improper public statements described herein.  As a member of the Compensation Committee, defendant White controlled the other defendants' stock option awards.  During the relevant period, White participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

35.    Defendant Lawrence P. Begley ("Begley") has served as a director of the Company and the Audit Committee financial expert since March 2005.  Begley has served as an independent financial consultant since May of 2001.  From March 2000 to May 2001, Begley served as Executive Vice President, CFO and Treasurer of CCBN.com.  From November 1999 to February 2000, he was

Executive Vice President, CFO and director of Razorfish, Inc.  From 1996 to November 1999, Begley served as Executive Vice President, CFO and director of iCube, Inc., a systems integration company, which was acquired by Razorfish, Inc. in November 1999.  Because of Begley's position, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Audit and Nominating and Corporate Governance Committees, defendant Begley caused or allowed the dissemination of the improper public statements described herein.  During the relevant period, Begley participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

36.     Defendant Maria A. Cirino ("Cirino") has served as a director of the Company since July 2001.  From February 2000 to February 2004, Cirino served as the CEO and Chairman of Guardent, Inc., a managed security services corporation.  On February 27, 2004, Guardent was acquired by VeriSign, Inc. a provider of critical infrastructure services for Internet and telecommunications networks.  Since then, Cirino has held the position of Senior Vice President of VeriSign Managed Security Services, a division of VeriSign.  From November 1999 to February 2000, Cirino served as Vice President of Sales and Marketing for Razorfish, Inc., a strategic digital communications company, and from July 1997 to November 1999, Cirino served as Vice President of Sales and Marketing of iCube, Inc., a systems integration company, which was acquired by Razorfish, Inc. in November 1999.  Because of Cirino's position, she knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future

business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  As a member (Chair) of the Nominating and Corporate Governance Committee, defendant Cirino caused or allowed the dissemination of the improper public statements described herein.  As a member of the Compensation Committee, defendant Cirino controlled the other defendants' stock option awards. During the relevant period, Cirino participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

37.     Defendant Philip J. Harkins ("Harkins") has served as a director of the Company since February 1997.  He is currently the President and CEO of Linkage, Inc., an organizational development company founded by Harkins in 1988. Prior to 1988, Harkins was Vice President of Human Resources of the Company.  Because of Harkins' position, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Nominating and Corporate Governance Committee, defendant Harkins caused or allowed the dissemination of the improper public statements described herein.  As a member (Chair) of the Compensation Committee, defendant Harkins controlled the other defendants' stock option awards. During the relevant period, Harkins participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

38.     Defendant John F. Rockart ("Rockart") has served as a director of the Company since its incorporation in March 1967.  Because of Rockart's position, he knew the adverse non-public

information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member (Chair) of the Audit Committee, defendant Rockart caused or allowed the dissemination of the improper public statements described herein.  As a member of the Compensation Committee, defendant Rockart controlled the other defendants' stock option awards.  During the relevant period, Rockart participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Rockart sold 15,822 shares of Keane stock for proceeds of $265,682 during the relevant period.

39.    Defendant Kirk E. Arnold ("Arnold") is, as of two weeks prior to the Acquisition announcement, a director, Vice Chair and CEO of the Company.

40.    Defendant John H. Fain ("Fain") has served as a director of the Company since November 2001 and served as a Senior Vice President of the Company from November 2001 to March 2002.  Prior to joining Keane, Fain was the founder, CEO, and Chairman of the Board of Directors of Metro Information Services, Inc. ("Metro"), a provider of information technology consulting and custom software development services.  Fain's role at Metro also included serving as President from July 1979 until January 2001.  Keane acquired Metro in November 2001.  In connection with this acquisition, Fain agreed to vote his shares, which represented 40% of Metro's outstanding shares, in favor of the deal and in exchange Fain would be elected to Keane's Board upon completion of the acquisition.  Because of Fain's position, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future

business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Fain participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Fain sold nearly 1.2 million shares of Keane stock for proceeds of over $15.7 million during the relevant period.

41.     Defendant Winston R. Hindle, Jr. ("Hindle") served as a director of the Company from February 1995 until May 2006.  Because of Hindle's position, he knew the adverse non-public information about the business of Keane, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Hindle participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

42.     The defendants identified in ¶¶25, 27, 35-38 and 40-41 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶26, 28-33 and 39 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶26-33, 38 and 40 are referred to herein as the "Insider Selling Defendants."

### DEFENDANTS' FIDUCIARY DUTIES TO THE CLASS IN CONNECTION WITH THE ACQUISITION

43.     In accordance with their duties of loyalty, care and good faith, the Director Defendants, as directors and/or officers of Keane, are obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

44.     Plaintiff alleges herein that the Director Defendants, separately and together, in connection with the sale of Keane, violated the fiduciary duties owed to plaintiff and the other public shareholders of Keane, including their duties of loyalty, good faith and independence, insofar as they stood on both sides of the transaction and engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by plaintiff or the Class.

45.     Defendants also owe the Company's shareholders a duty of complete honesty and candor, which they have breached and continue to breach by failing to disclose all material information to shareholders, including information regarding the true value of the Company and its prospects and assets.

46.     Because the Director Defendants have breached their duties of loyalty, good faith and independence in connection with the sale of Keane, the burden of proving the inherent or entire fairness of the Acquisition, including all aspects of its negotiation and structure, is placed upon the Director Defendants as a matter of law.

### DEFENDANTS' FIDUCIARY DUTIES TO THE COMPANY
### IN CONNECTION WITH PLAINTIFF'S DERIVATIVE CLAIMS

47.     Each officer and director of Keane named herein owed the Company and Keane shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Keane's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of Keane. Further, the misconduct of Keane's officers has been ratified by Keane's Board, which has failed to take any legal action on behalf of the Company against them.

48. By reason of their positions as officers, directors and fiduciaries of Keane and because of their ability to control the business and corporate affairs of the Company, the defendants owed Keane and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Keane in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Keane and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, the defendants had a duty to refrain from utilizing their control over Keane to divert assets to themselves via improper and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

49. Because of their positions of control and authority as directors or officers of Keane, each of the defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in defendants' option backdating scheme; and (ii) willingness to cause Keane to disseminate false Proxy Statements for 1995-2006, which Proxy Statements failed to disclose defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received. Because of their positions with Keane, each of the defendants was aware of these

wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to Keane shareholders and the financial markets but failed to do so.

50.     Between 1995 and 2006, defendants repeated in each Proxy Statement that the stock option grants made during that period carried an exercise price that was not less than the fair market value of Keane stock on the date granted, as calculated by the public trading price of the stock at the market's close on that date.   However, defendants concealed that the stock option grants were repeatedly and consciously backdated to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period.   Due to defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company.   In the alternative, plaintiff seeks to have all of the unexercised options granted to defendants between at least 1995 and 2002 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have defendants revise the Company's financial statements to reflect the truth concerning these option grants.

51.     To discharge their duties, the directors of Keane were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Keane.   By virtue of such duties, the officers and directors of Keane were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of Keane in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Keane);

(b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of Keane to engage in self-dealing;

(c)      neither violate nor knowingly permit any officer, director or employee of Keane to violate applicable laws, rules and regulations;

(d)      remain informed as to the status of Keane's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)      prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)      establish and maintain systematic and accurate records and reports of the business and affairs of Keane and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)      maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Keane's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)      exercise control and supervision over the public statements to the securities markets and trading in Keane stock by the officers and employees of Keane; and

(i)      supervise the preparation and filing of any financial reports or other information required by law from Keane and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Keane and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.      Each defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Keane, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the defendants who were also officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised Keane's Board during the relevant period.

53.      Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the defendants from taking such illegal actions.  As a result, Keane has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)      improvidently paid executive compensation;

(b)      increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

(c)     potential costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(d)     incurring possible IRS penalties for improperly reporting compensation.

54.     These actions have irreparably damaged Keane's corporate image and goodwill.  For at least the foreseeable future, Keane will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Keane's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION IN CONNECTION WITH PLAINTIFF'S DERIVATIVE CLAIMS

55.     In committing the wrongful acts alleged herein, defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

56.     During all times relevant hereto, defendants collectively and  individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to Keane insiders and directors and causing Keane to misrepresent its financial results; (ii) maintain defendants' executive and directorial positions at Keane and the profits, power and prestige which defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Keane, regarding defendants' compensation practices and Keane's financial performance.

57.     The purpose and effect of defendants' common course of conduct was, among other things, to disguise defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of Keane

common stock so they could dispose of millions of dollars of their own Keane stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

58.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Keane's financial results.   Each of the defendants was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

59.     Each of the defendants aided and abetted and rendered substantial  assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action on his own behalf and as a class action on behalf of all holders of Keane stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

61.     This action is properly maintainable as a class action.

62.     The Class is so numerous that joinder of all members is impracticable.  According to Keane's Securities and Exchange Commission ("SEC") filings, there were more than 58 million shares of Keane common stock outstanding.

63.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)    whether defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Acquisition;

(b)    whether the Director Defendants are engaging in self-dealing in connection with the Acquisition;

(c)    whether the Director Defendants are unjustly enriching themselves and other insiders or affiliates of Keane;

(d)    whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Acquisition, including the duties of good faith, diligence, candor and fair dealing;

(e)    whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(f)    whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

64.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

65.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

66.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

67.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

68.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DERIVATIVE ALLEGATIONS

69.     Plaintiff brings this action derivatively in the right and for the benefit of Keane to redress injuries suffered and to be suffered by Keane as a direct result of defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

70.     Plaintiff will adequately and fairly represent the interests of Keane and its shareholders in enforcing and prosecuting its rights.

71.     Plaintiff is an owner of Keane stock and was an owner of Keane stock during times relevant to defendants' illegal and wrongful course of conduct alleged herein.

72.     Written demand was made on the Company on February 13, 2007.

73.     Based upon the facts set forth throughout this Complaint and applicable law and given that defendants are pressing ahead with their plan to quickly complete a merger of the

Company, the Company would suffer irreparable injury if plaintiff were required to wait the requisite period of time following demand before commencing this action.

74.     The members of Keane's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

75.     The Keane Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Keane's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting.  Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to Keane and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting.  Certain directors are also dominated and controlled by other directors and cannot act independently of them. Thus, the Keane Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

76.     The acts complained of constitute violations of the fiduciary duties owed by Keane's officers and directors and these acts are incapable of ratification.

77.     The members of Keane's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

78.     Any suit by the current directors of Keane to remedy these wrongs would likely further expose the liability of defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

79.     Keane has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Keane any part of the damages Keane suffered and will suffer thereby.

80.     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

81.     Keane's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Keane. However, due

to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by Keane against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Keane, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

82.     In order to bring this action for breaching their fiduciary duties, the members of the Keane Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

## FACTUAL ALLEGATIONS

83.     Keane provides information technology and business process services through an integrated network of regional offices in North America, the United Kingdom, and Australia and through advanced development centers in the United States, Canada, and India.

**Keane Becomes Entangled in Scandals Concerning Its Executives**

84.     On May 11, 2006, *The Boston Herald* reported on the scandal which prompted defendant Brian Keane to step down as the Company's President:

> Boston's Keane Inc. was rocked yesterday by the abrupt resignation of its chief executive over what sources say involved allegations of sexual harassment of a female executive.
>
> Keane, a computer consultant for major corporations, declined to detail exactly why the 45-year-old Brian Keane, son of the company's founder, John Keane, stepped down late yesterday.

In a statement, the company would only say that it had received "employee allegations relating to Mr. Keane's personal conduct." That statement said Keane had denied "any unlawful behavior."

A statement issued by Brian Keane, who also is stepping down as president and as a director at the firm, said he quit in order not to burden the company.

"The allegations leveled against me are utterly baseless and false, and I intend to work with the company to vigorously refute them in any and every available forum," said Keane, without mentioning what the charges were about.

Keane, who became CEO in 1999, added the "mere existence of these untrue allegations present a distraction that I wish to avoid for the company my father founded 41 years ago."

Keane, who owns 5.2 percent of Keane's shares valued at more than $42 million, will be given a consulting contract with the company running through the end of 2007, the company said.

While the company was tight-lipped about the allegations, sources told the Herald they include charges of sexual harassment leveled by a female executive.

The company announced the immediate appointment of John J. Leahy, chief financial officer, as interim chief executive while an external and internal search for a new leader is conducted.

The company, which has about 600 employees in Massachusetts and 10,000 worldwide, also has formed a new "office of the president" consisting of other top executives at the firm.

"Keane Inc. has a history of high standards for employee conduct that go beyond what the law requires," said Maria Cirino, chairwoman of the board of directors' corporate governance committee.

She said the controversy does not involve corporate operations.

"The board is confident that our experienced senior executives and Keane's outstanding employees will provide strong and steady leadership during this transition period," Cirino said in a statement issued by Keane.

Before yesterday's resignation announcement, Keane's stock closed at $14.36, down 10 cents.

85.     Later that same week, defendant Brian Keane acknowledged that his conduct

"reflected poor judgment."  *The Boston Globe* reported on further developments in the scandal:

Technology services firm Keane Inc. yesterday confirmed that Brian T. Keane resigned as chief executive this week because he was accused of sexual harassment and said that he had acknowledged that his conduct "reflected poor judgment."

The company also said the accusations against its former chief, who publicly called them "utterly baseless and false," came from one current and one former employee, and that Keane "admitted to personal conduct" that went beyond actions already revealed in press accounts.

*     *     *

Larry Begley, a Keane board member who serves on its audit and corporate governance committees, last night said company directors "were told more than appeared in the article," quoting Marilyn Keane on the charges. But he would not specify what the directors were told or specifically rebut Marilyn Keane's account.

"Although Brian denied that he engaged in unlawful sexual harassment, he did admit to the board certain personal conduct in addition to what appeared in the press," Begley said. "Brian acknowledged to the board, and the board concurred, that his personal conduct reflected poor judgment."

Begley declined to detail the alleged misconduct. He also declined to say whether it involved physical or sexual contact.

The board said its statement was intended to answer "misleading information" from "individuals who were not involved in the decision-making process and who may not have received complete information regarding the allegations."

*     *     *

According to a timetable outlined by the company yesterday, Brian Keane received the first of the employee allegations on April 25 but only notified the board's corporate governance committee last week. Working with lawyers inside and outside the company, the board worked throughout last weekend to investigate the allegations and determine a course of action in the interest of company shareholders. On Wednesday, the chief executive agreed to step down.

"Although Brian Keane denied that he had engaged in unlawful sexual harassment, he admitted to certain personal conduct, including conduct in addition to the matters that have appeared in the press," the company's statement said. "Brian Keane acknowledged and the board concurred that this personal conduct reflected poor judgment.

"Based on this information, and other relevant considerations, the board concluded that Mr. Keane could not continue to provide the leadership that Keane requires and that his continued service as CEO would not be in the best interests of the company."

- 30 -

In a Wednesday statement, Brian Keane, who became chief executive in 1999, had dismissed the allegations against him as "utterly baseless and false" and said he would work with the company to refute them. He said he had decided to step down because the charges presented a distraction for the company his father, John Keane Sr., started above a doughnut shop near Hingham harbor four decades ago. The father remains chairman of the board, and John F. Keane Jr., Brian's brother, also remains a director.

Begley, in an interview, characterized Keane's decision to step down as "very much a joint decision." He said no lawsuits had been filed against the company. As part of the resignation agreement, Keane will stay on as a consultant through the end of 2007.

John J. Leahy, the company's executive vice president and chief financial officer, is serving as interim president and chief executive while the board conducts a search for Keane's successor.

The company "is determined to put the distraction caused by this unfortunate incident behind it and is convinced that the actions taken this week will expedite that necessary process," its statement said.

Asked why the board decided to allow Brian Keane to remain a $26,000-a-month consultant for the company, Begley noted, "That's a fraction of what he was being paid" and also said that "We felt there was some value, from a continuity standpoint, to have him available as a consultant to the board on an as-needed basis."

"This is a savvy board that has a real appreciation for what they're being paid to do, which is to protect shareholders' interest," Begley said.

86. *The Boston Herald* revealed later that same day that a second person was also

accusing defendant Brian Keane of sexual harassment:

A second person has stepped forward to accuse ousted chief executive Brian Keane of sexual harassment, Keane Inc. said yesterday, amid what appears to be a growing rift between board directors and the founding family of the Boston tech company.

Meanwhile, an attorney for Georgina Fisk, a Keane marketing executive who is one of the women to charge her ex-boss with sexual harassment, issued her own warning shot yesterday by deploring any attempt at "intimidation tactics and smear campaigns.''

Barbara Robb, the attorney, said she was talking in general about women who step forward with accusations of sexual harassment, not about a specific case.

But her back-off message was clear, as more information spilled out yesterday about the evolving Keane case.

In a statement, Keane Inc. said Brian Keane, who was forced out earlier this week amid misconduct allegations, has admitted to behavior that was in "poor judgment."

The statement added his behavior went beyond previously published press reports, an apparent reference to Keane allegedly bemoaning the state of his marriage to Fisk while inviting her to go boating with him.

Keane didn't name the second person – described only as a "former employee" – who also leveled a sexual harassment charge.

The statement indicated that Keane, son of company founder John Keane, violated an agreement by putting out his own press release on Wednesday that only "contributed to confusion."

87.    On June 14, 2006, the Company revealed it would pay $1.4 million to settle the

sexual harassment allegations:

Charlestown technology firm Keane Inc. revealed yesterday that it will pay $1.14 million to settle a sexual harassment complaint by a top female employee that led to the resignation last month of its president and chief executive, Brian T. Keane. The publicly traded company also settled a second harassment allegation made against Keane by a former female employee, but the amount of that agreement was not made public.

The settlements, disclosed in a financial filing yesterday, bring legal closure to a public relations fiasco that has dogged the firm since Brian Keane stepped down May 10, after being accused of harassment by its vice president of marketing, Georgina Fisk, and the former employee, who has not been publicly identified.

As part of the agreement, Fisk will resign June 30. Because Fisk is an officer, Keane was required to disclose the amount of her settlement, according to Keane's marketing director, Veronica Kido. The other employee was not an officer, so her settlement was not disclosed, Kido said.

Boston attorney Robert B. Gordon, who specializes in employment law, described Fisk's settlement, which includes $80,000 in attorney fees, as "a very substantial amount of money."

88.    In response to these developments, the Company's stock price fell from nearly $16

per share down to just over $11 per share.

- 32 -

89.     On September 29, 2006, the Company announced preliminary results for its third

quarter 2006, which release stated in part:

> Keane, Inc., a leading business process and information technology (IT) services firm, today announced its preliminary results for its Third Quarter ending September 30, 2006.
>
> Based on its current outlook, Keane expects revenues for its Third Quarter to be in the range of $230 million to $232 million. This is below the Company's previous guidance of a range of $240 million to $250 million. Keane estimates its diluted earnings per share for the Third Quarter will be in the range of $.11 to $.13, down from previous guidance of $.13 to $.15.
>
> *       *       *
>
> "We continue to realize cost savings from Keane's ongoing transformation, however, top line growth is taking longer than we had anticipated," said John Leahy, interim president and CEO, and executive vice president and chief financial officer of Keane. "We are confident that our strategy will result in Keane becoming a stronger global competitor and position the Company for strong financial performance in 2007."

90.     Also on September 29, 2006, still in the midst of a four-month-long nationwide

search to replace defendant Brian Keane, and after the Company's stock had struggled back up to the

$15 per share level, the Company was forced to announce it had fired yet another executive officer

for "just cause:"

> Boston technology services firm Keane Inc., still recovering from the resignation of a chief executive accused of sexual harassment, yesterday said it had fired the executive many on Wall Street had expected to succeed him.
>
> The company said it dismissed Richard S. Garnick, its president of North American services and global business lines, for "just cause" relating to unspecified travel expenses and unauthorized communications. In a statement, Keane said it would not release details of the incidents because it was a personnel matter.
>
> Interim chief executive John J. Leahy last night said he made the decision to terminate Garnick, effective immediately, after consulting with lawyers inside and outside the company. The lawyers and Keane's board of directors agreed Garnick's actions "had the potential to be very damaging to the company and its shareholders," said Leahy, though he would not discuss specifics.

Garnick said in an interview that he did nothing wrong, and the company was using two incidents as an excuse to withhold more than $2 million it had agreed to pay him if he wasn't named chief executive. "We were driving positive changes," Garnick said. "People felt uncomfortable. They used these incidents as a means to fight that change."

Boston lawyer Patrick J. Bannon, an attorney for Garnick, said his firm, McCarter & English, was preparing a breach of contract lawsuit against Keane and would seek to recover the money owed to Garnick. "There was no basis for termination," Bannon said. "This is damaging to an executive's reputation."

Word of Garnick's dismissal, released after the market closed, came as Keane also cut its third-quarter guidance, citing a slowdown in sales growth. The company, based in Charlestown, said it now expects to earn 16 cents to 18 cents a share in the July-to-September period, down from the 18 to 20 cents it had forecast. On the revenue side, Keane estimated it will ring up $230 million to $232 million, down from its earlier expectation of $240 million to $250 million.

A subcommittee of Keane's board has been interviewing candidates to replace Brian T. Keane, the son of the company's founder, who resigned as chief executive May 10 after two female employees internally lodged harassment complaints. Keane, denying the accusations, admitted to "poor judgment" in his personal conduct. The company paid $1.14 million to settle one complaint, and an undisclosed sum to settle the other.

The board's search panel is scheduled to name a chief executive by the end of the year, said Russell J. Campanello, the company's senior vice president for human resources. Garnick, who had been recruited by Brian Keane from Indian outsourcing giant Wipro, had been considered a leading candidate. Other candidates include Leahy, a company veteran, and some outside executives.

Leahy, Garnick, and Campanello have been working together as a transition team known as the "office of the president" since May.

Garnick said he was told of his dismissal Monday. He said the company cited a one-day business trip he made to Washington on Sept. 13 when he met with representatives of the Carlyle Group private equity firm, an information technology trade association, and a potential recruit for Keane. All the meetings were related to Keane business, Garnick said, though he acknowledged he also discussed "potential opportunities" with Carlyle if he wasn't named Keane's chief executive. Garnick said Keane officials were aware of those discussions.

Keane executives also confronted Garnick, he said, about a Sept. 21 e-mail exchange he had with a New York public relations representative, Hugh Burnham of Gutenberg PR. Burnham alerted him that Wachovia Securities analyst Edward Caso had downgraded Keane's stock rating from "outperform" to "market perform"

because of Caso's concern that Keane would tap an outside chief executive who would be slower to change the company's business model.

In his response to Burnham, which Garnick provided to the Globe last night, he wrote, "Thanks for the note. Any way to get some expanded press to follow-up on this that puts pressure on board to make move?" Garnick said this was a reference to the chief executive search.

Leahy insisted Garnick's firing was justified. "In our view, there were certainly grounds for termination," he said. On the issue of severance, he said, "Any agreement we had would have ended with his dismissal." Leahy would not comment on a potential lawsuit.

Keane informed its employees of Garnick's dismissal yesterday and plans to disclose a restructuring next week in which a pair of veteran executives will be promoted to new jobs on the leadership team, taking over Garnick's responsibilities, Leahy said.

"I think there will be concern that there could be more distractions," Leahy said. "But we're a resilient company, and we're moving very quickly in terms of laying out a new organization."

91.     Then, on October 4, 2006, *The Boston Herald* reported that the most recently ousted

executive had sued the Company over "trumped-up charges:"

Keane Inc. personnel rifled through e-mails and solicited criticism from employees in an effort to find dirt to fire a top executive believed to be in line to become the next chief executive, according to a lawsuit filed yesterday.

Richard S. Garnick, who until last Friday was president of Keane's North American and global business units, painted a picture in court filings of a power struggle at Keane in which he and interim CEO John J. Leahy were no longer even talking.

Garnick's lawsuit, filed in Massachusetts Superior Court only four days after his ouster from Boston-based Keane, said the company trumped up false charges against him in order to break a $2 million severance contract.

Garnick's suit accuses Keane of breach of contract and defamation, as well as invading his privacy by wrongly leaking his name last spring during an ugly sexual-harassment spat that ultimately led to the resignation of then-chief executive Brian Keane.

Last Friday, Keane announced it had fired Garnick for "just cause'' due to unspecified travel expenses and communications. Leahy was quoted as saying that Keane board members and lawyers agreed Garnick's alleged actions had the potential to be "very damaging.''

A Keane spokeswoman in a statement yesterday said the company stands by its action against Garnick and intends to "vigorously'' defend itself against Garnick's charges.

**Defendants Engaged in Repeated Options Timing and/or Backdating**

92.     Throughout the relevant period, defendants caused Keane to grant them millions of stock options permitting them to buy Keane stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

93.     However, many of the hundreds of thousands of options granted to Keane's executives had a hidden, valuable component:  they were misdated, often making them even more significantly valuable.  The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g.*, a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.*, a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.*, where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

**Defendants' Stock Option Grants**

94.     Certain of Keane's manipulative stock option grants are described below (adjusted for stock splits):

### 1995 Option Grants

95.     Defendants dated many of Keane's 1995 option grants as of February 6, 1995 at $5.19 per share – ***the closing price low of the year***.  In 1995, the stock traded between $5.19 and $7.66 with an average closing price of $6.30 per share.  Moreover, the exercise price was the closing price low for the month of February 1995 when the stock traded between $5.19 and $6.06 per share with an average closing price of $5.48 per share.  This stock grant further came immediately after a sharp decline and immediately before a sharp spike in the Company's stock price.  Defendants Paris and Cataldo received 36,000 and 30,000 options at this price, respectively.  Former Senior Vice President Edward Longo ("Longo") and Vice President Edward C. Sugrue ("Sugrue") received 48,000 and 30,000 options at this price, respectively.

### 1997 Option Grants

96.     Defendants dated many of Keane's 1997 option grants as of January 27, 1997 at $15.06 per share – ***the second lowest closing price low of the yea***r.  In 1997, the stock traded between $14.88 and $40.69 with an average closing price of $26.32 per share.  Moreover, this stock grant came immediately before a sharp spike in the Company's stock price.  The price of the stock 20 trading days after the grant was $18.44 per share, for a 20-day cumulative return, based on the exercise price, of 22%.  Defendants John Keane, Jr., Brian Keane and Paris received 10,000, 10,000 and 8,000 options at this price, respectively.  Former executive Longo received 16,000 options at this price.

### 1998 Option Grants

97.     Defendants dated many of Keane's 1998 option grants as of January 16, 1998 at $38.38 per share.  This stock grant came immediately before a sharp spike in the Company's stock price.  The price of the stock 20 trading days after the grant was $44.50 per share, for a 20-day cumulative return, based on the exercise price, of 16%.  Defendants John Keane, Jr., Brian Keane and Paris received 30,000, 30,000 and 5,000 options at this price, respectively.  Former executive Longo received 20,000 options at this price.

### 1999 Option Grants

98.     Defendants dated many of Keane's 1999 option grants as of April 6, 1999 and April 7, 1999 at $18.50 and $18.00 per share, respectively – *the two lowest closing prices of the year*.  In 1999, the stock traded between $18.00 and $42.50 with an average closing price of $26.44 per share.  Moreover, the exercise prices were the closing price lows for the month of April 1999 when the stock traded between $18.00 and $25.88 per share with an average closing price of $21.51 per share.  These stock grants further came immediately after a sharp decline and immediately before a sharp spike in the Company's stock price.  Defendants John Keane, Sr., John Keane, Jr., Brian Keane, Paris and Southard received 30,000, 30,000, 30,000, 4,000 and 5,000 options dated April 6, 1999, respectively.  Former executive Longo received 10,000 options dated April 6, 1999.  Defendants John Keane, Sr., John Keane, Jr., Brian Keane, Paris and Southard received 50,000, 100,000, 100,000, 7,500 and 15,000 options dated April 7, 1999, respectively.  Former executive Longo received 25,000 options dated April 7, 1999.

### 2000 Option Grants

99.     Defendants dated many of Keane's 2000 option grants as of December 29, 2000 at $9.75 per share – *the closing price low of the year*.  In 2000, the stock traded between $9.75 and $30.94 with an average closing price of $20.85 per share.  Moreover, the exercise price was the

closing price low for the month of December 2000 when the stock traded between $9.75 and $12.96 per share with an average closing price of $11.28 per share.  This stock grant further came immediately after a sharp decline and immediately before a sharp spike in the Company's stock price.  Defendants John Keane, Sr., John Keane, Jr., Brian Keane, Leahy, Atwell and Paris received 100,000, 10,000, 200,000, 60,000, 60,000 and 30,000 options at this price, respectively.

100.    Below are certain of Keane's stock option grants which occurred right before significant stock price increases (adjusted for stock splits):











101.    Complicating matters and magnifying the harm to Keane, during the relevant period, Keane's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

102.    Specifically, in many instances the reported dates Keane stock options were granted differed from the dates on which the options appear to have been actually granted.  The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose. ***In almost every case of misdating, the price of Keane shares on the reported option-grant date was lower than the share price on the actual day the options were issued.***

103.    Through their fiduciary duties of care, good faith and loyalty, defendants owed to Keane a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material non-public information included the problems Keane faced because of its deficient internal controls.  Furthermore, defendants who were members of the Audit Committee during the relevant period had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with

management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies.  Defendants, as officers of Keane, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, defendants who were directors of Keane during the relevant period had ample opportunity to discuss this material information with fellow directors at any of the scores of Board meetings that occurred during the relevant period as well as at committee meetings of the Board.  Despite these duties, defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by Keane to the investing public and the Company's shareholders during the relevant period.

104.    Specifically, since at least 1995, defendants have caused Keane to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| FISCAL YEAR | REPORTED EARNINGS (in millions) | REPORTED DILUTED EARNINGS PER SHARE FROM CONTINUING OPERATIONS |
|---|---|---|
| 1995 | $19.26 | $0.30 |
| 1996 | $25.36 | $0.38 |
| 1997 | $45.95 | $0.68 |
| 1998 | $96.35 | $1.47 |
| 1999 | $73.07 | $1.12 |
| 2000 | $20.35 | $0.51 |
| 2001 | $17.39 | $0.46 |
| 2002 | $8.18 | $0.38 |
| 2003 | $29.22 | $0.52 |
| 2004 | $32.28 | $0.62 |
| 2005 | $33.43 | $0.68 |

105.    Moreover, throughout the relevant period certain defendants exercised many of these stock options contributing to their ability to sell over $35.5 million worth of Keane stock they obtained often by cashing in under-priced stock options:

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| ATWELL | 05/09/00-03/13/06 | 55,400 | $878,399 |
| J. KEANE JR. | 05/02/00-06/09/04 | 88,587 | $1,813,500 |
| B. KEANE | 11/20/97-12/14/01 | 161,200 | $7,739,432 |
| CAMPANELLO | 12/18/06 | 7,875 | $94,897 |
| CATALDO | 11/07/96-08/17/98 | 90,000 | $2,975,425 |
| FAIN | 12/09/02-11/02/04 | 1,187,540 | $15,784,571 |
| LEAHY | 06/07/05-12/20/06 | 32,508 | $406,328 |
| PARIS | 02/23/96-09/13/06 | 294,200 | $5,447,364 |
| ROCKART | 12/31/98-09/11/03 | 15,822 | $265,682 |
| SOUTHARD | 08/18/98 | 2,200 | $121,000 |
| TOTAL | | 1,935,332 | $35,526,598 |

106.    In effect, during the relevant period, the defendants caused Keane's shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, defendants caused or allowed Keane to issue statements that failed to disclose or misstated the following:  (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of Keane's earnings and earnings per share.

**Defendants' Scheme Begins To Unravel**

107.    The 1995-2006 Proxy Statements concealed defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of defendants' wrongdoing when voting on proxy proposals between 1995 and 2006.  Defendants have been unjustly enriched at the expense of Keane, which has received and will receive less money from the defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

108.    Each dollar diverted to defendants via the option backdating scheme has come at the expense of the Company.  For example, if B. Keane's 100,000 options granted on April 7, 1999 had not been manipulated, but rather had a strike price of $24.00 – the stock trading price 20 days later –

instead of the $18.00 strike price, which was the trading low for the year when B. Keane exercised those options, the Company would receive $2.4 million instead of $1.8 million – *a cost to the Company of $600,000 for this single instance of option backdating*.

**The Adverse Impact of Defendants' Options Backdating Misconduct**

109.    Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, defendants ensured that executives would not have any such restrictions.  Given the many times Keane's grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

110.    As a result of the backdating of options, defendants have been unjustly enriched at the expense of Keane, which has received and will receive less money from defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

**The Acquisition**

111.    Seeking to create the appearance of a more balanced Board, as defendants were preparing to publicly announce the Acquisition, they also rushed  to announce the appointment of the Company's new Vice Chair, CEO and director – defendant Arnold.  While Arnold's appointment would commence January 29, 2007, and for appearance purposes ends on February 7, 2007, Arnold would not be short-changed as her "payment for appearance" was already embedded into the terms of the sale of the Company.

112.    On January 22, 2007, the Company filed a Form 8-K with the SEC, which stated in part:

> On January 22, 2007, Keane, Inc. a Massachusetts corporation, entered into an Employment Agreement with Kirk Arnold providing for her employment as Vice Chair of the Board of Directors and Chief Executive Officer of the Company,

- 45 -

effective January 29, 2007.  The Board of Directors has also elected Ms. Arnold to the Board of Directors and appointed Ms. Arnold as President of the Company, effective January 29, 2007.

\*      \*      \*

*Pursuant to the Employment Agreement, Ms. Arnold will be entitled to receive a base salary at an annualized rate of not less than $600,000 and will be eligible for an annual bonus, the target amount of which will be 100% of her base salary.  At the sole discretion of the Board of Directors, for Ms. Arnold's first year of employment, the Company may also award Ms. Arnold a sign-on bonus of up to $250,000.  Pursuant to the Employment Agreement, on January 29, 2007, Ms. Arnold will receive a grant of options to purchase 550,000 shares of common stock of the Company and 200,000 shares of restricted stock of the Company (the "Equity Awards").  The Equity Awards will vest in four equal annual installments beginning on the first anniversary of the grant date, and the options will have an exercise price equal to the fair market value of the Company's common stock on January 29, 2007.*

\*      \*      \*

If Ms. Arnold's employment is terminated by the Company without cause or by Ms. Arnold for good reason (each as defined in the Employment Agreement), in either case following a change of control of the Company, Ms. Arnold will be entitled to a lump sum payment equal to two times her base salary and two times her targeted annual bonus.  *In addition, her stock options and restricted stock will vest in full*, subject to certain limitations specified in the Employment Agreement.

113.    Then, on February 5, 2007, the Company announced it would host a conference call on February 14, 2007 to discuss its fourth quarter 2006 and fiscal year 2006 results for the period ended December 31, 2006.

114.    The defendants had long been discouraged by the lack of liquidity in their 11.6 million share position.  Since the depth of the market for the Company's shares would not support the defendants' attempts to unload these shares on a market which rarely traded more than a few hundred thousand shares, defendants sought to sell the Company to the first company that would offer cash – even in the face of a more profitable stock-for-stock purchase.

115.    Moreover, as defendants' gross mismanagement and malfeasance over the past decade has exposed them to potential civil and criminal liability for violations of federal and state

law, defendants sought to extricate themselves from Keane before the Company became embroiled in the stock option backdating scandal.

116.    On February 7, 2007, the Company issued a press release entitled "Caritor, Inc. to Acquire Keane, Inc. for $14.30 Per Share in Cash – Combined Company Will Bring Together Keane, Inc.'s IT Delivery and Client Service Capabilities and Caritor's Leading US-based Global IT Services Business; Expected to Retain Keane, Inc. Name and Employee Base," which stated in part:

> Caritor, Inc., a global provider of IT services, and Keane, Inc, a leading business process and IT services firm, today announced that they have entered into a definitive agreement for Caritor to acquire Keane for an all-cash purchase price of approximately $854 million.

> Under the terms of the merger agreement, holders of Keane's common stock will receive $14.30 per share in cash.  The purchase price represents a 19 percent premium over Keane's closing share price on February 6, 2007.

> The transaction will be financed through a combination of equity to be contributed to Caritor by Citigroup Venture Capital International and debt financing that has been committed by Citigroup Global Markets Inc., UBS Securities LLC, and Bank of America Securities LLC.  There is no financing condition to the obligation of Caritor to consummate the transaction.

> The Boards of Directors of both Keane and Caritor have each approved the transaction.  Members of the Keane family and affiliated entities (representing approximately 20 percent of the current shares outstanding) have committed to vote their Keane shares owned by them in favor of the merger.

> The resulting private company, with anticipated annual revenues over $1 billion and more than 14,000 professionals, is expected to be well positioned to deliver comprehensive IT and business process services to its clients, bringing together the strength of Keane's IT delivery and client service capabilities with the flexibility of Caritor's leading US-based global IT services business.  Following completion of the transaction, it is expected that the combined company will operate under the Keane name and maintain Keane's employee base in Boston, Massachusetts.  US operations for the combined company will be based in Boston. Caritor Chairman and CEO Mani Subramanian will become Chairman and CEO of the combined entity.

> "Caritor was founded on the belief that there was a strong need for a properly proportioned, US-based multi-national resource to meet the ever-growing software development and business process outsourcing needs of our global clients," said Mani Subramanian, founder, chairman and CEO of Caritor.  "Today, it is clear that

clients require strong, locally-based consulting and client service combined with the flexibility and cost-effectiveness of a broad range of global IT services.   The combination of Caritor and Keane will offer clients these comprehensive services. Both Caritor and Keane have a strong reputation for delivering value to their clients, many of whom have been clients of long-standing.  I look forward to working with a combined team of professionals to build upon the tradition of integrity and client service common to both Caritor and Keane."

"After careful consideration of the full range of strategic alternatives, the Keane Board of Directors concluded that this transaction is in the best interest of Keane's shareholders.  As a private company, combined with Caritor, Keane will be better positioned to continue to invest in growth, provide new employee opportunities, and service its clients, " said John Keane Sr., founder and chairman of Keane, Inc.

"This is a significant transaction for the industry and reflects our confidence in the new entity, its potential and its employees," said Dipak Rastogi, Head of Citigroup Venture Capital International (CVCI), an investor in Caritor.   "The combination of Caritor and Keane will provide clients with substantially expanded services and distinct global capabilities.  We are pleased to have the opportunity to help our portfolio companies realize their aspirations."

The transaction is expected to be completed in the Second Quarter of calendar year 2007, subject to receipt of Keane stockholder approval and customary regulatory approvals, as well as satisfaction of other customary closing conditions. Upon closing, the transaction is expected to be financed through a combination of equity to be contributed to Caritor by an affiliate of CVCI and debt financing provided by Citigroup, UBS and Bank of America.

Important Additional Information Will Be Filed With The SEC

Keane plans to file with the SEC and mail to its stockholders a Proxy Statement in connection with the transaction.  The Proxy Statement will contain important information about Keane, the merger and related matters.  Investors and security holders are urged to read the Proxy Statement carefully when it is available.

Investors and security holders will be able to obtain free copies of the Proxy Statement and other documents filed with the SEC by Keane through the Web site maintained by the SEC at www.sec.gov.  In addition, investors and security holders will be able to obtain free copies of the Proxy Statement from Keane by contacting Larry Vale at 617-517-1290.

Keane and its directors and executive officers, may be deemed to be participants in the solicitation of proxies from Keane's stockholders with respect to the transactions contemplated by the merger agreement.  Information regarding Keane's directors and executive officers is contained in Keane's Annual Report on Form 10-K for the year ended December 31, 2005 and its proxy statement dated

April 6, 2006 for its Annual Meeting of Stockholders, which are filed with the SEC, as well as Keane's Current Reports on Form 8-K filed with the SEC on January 1, 2006, March 29, 2006, June 23, 2006, October 23, 2006 and January 25, 2007. As of January 31, 2007, Keane's directors and executive officers beneficially owned (as calculated in accordance with SEC Rule 13d-3) approximately 11.6 million shares, or 19 percent, of Keane's common stock. You can obtain free copies of these documents from Keane using the contact information set forth above. Additional information regarding interests of such participants will be included in the Proxy Statement that will be filed with the SEC and available free of charge as indicated above.

Advisors

Citigroup and UBS acted as financial advisors to CVCI and Caritor in connection with the transaction. Morgan Stanley & Co. Incorporated acted as financial advisor to the Board of Directors of Keane and provided a fairness opinion to it in connection with the transaction.

Cleary Gottlieb Steen & Hamilton LLP acted as legal advisor to CVCI and Caritor, and Paul Hastings acted as legal advisor to Caritor in connection with the transaction. Wilmer Cutler Pickering Hale and Dorr LLP acted as legal advisor to Keane in connection with the transaction.

**Self-Dealing in Connection with the Acquisition**

117. By reason of their positions with Keane, the Director Defendants are in possession of non-public information concerning the financial condition and prospects of Keane, and especially the true value and expected increased future value of Keane and its assets, which they have not disclosed to Keane's public stockholders. Moreover, despite their duty to maximize shareholder value, the defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of Keane's public shareholders.

118. The proposed sale is wrongful, unfair and harmful to Keane's public stockholders in that it is an unfair price and the result of an unfair process, and represents an effort by defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members. The Acquisition is an attempt to deny plaintiff and the other members of the Class their rights while usurping the same for the benefit of Caritor on unfair terms.

119.    In light of the foregoing, the Director Defendants must, as their fiduciary obligations require:

- Enjoin the payment of all "change in control" payments, including the payments and stock grants awarded to defendant Arnold on January 29, 2007.

- Withdraw their consent to the sale of Keane and allow the shares to trade freely – without impediments.

- Act independently so that the interests of Keane's public stockholders will be protected, including, but not limited to, the retention of truly independent advisors and/or the appointment of a truly independent Special Committee.

- Adequately ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Keane's public stockholders.

- Fully and fairly disclose all material information to the Company's shareholders.

120.    The current directors have also approved the Acquisition so that it transfers 100% of Keane's revenues and profits to Caritor, thus all of Keane's operations will now accrue to the benefit of Caritor.

## COUNT I

**Class Claim for Breach of Fiduciary Duties**
**Against Defendants John Keane, Sr., John Keane, Jr., Brian Keane,**
**White, Begley, Cirino, Harkins, Rockart, Arnold and Fain**

121.    Plaintiff repeats and realleges each allegation set forth herein.

122.    The defendants named in this claim have violated fiduciary duties of care, loyalty, candor and independence owed under applicable law to the public shareholders of Keane and have acted to put their personal interests ahead of the interests of Keane's shareholders.

123.    By the acts, transactions and courses of conduct alleged herein, these defendants, individually and acting as a part of a common plan, are attempting to advance their interests at the expense of plaintiff and other members of the Class.

124.     The defendants named in this claim have violated their fiduciary duties by entering into a transaction with Caritor without regard to the fairness of the transaction to Keane's shareholders.  Each of these defendants has directly breached and/or aided and abetted the other defendants' breaches of fiduciary duties owed to plaintiff and the other holders of Keane stock.

125.     As demonstrated by the allegations above, the defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Keane because, among other reasons:

(a)     they failed to properly value Keane;

(b)     they ignored or did not protect against the numerous conflicts of interest resulting from their own interrelationships or connection with the Acquisition; and

(c)     they abused the Proxy process to aggrandize their own wealth upon the sale and their recommendation to endorse the sale of the Company.

126.     Because the defendants named in this claim dominate and control the business and corporate affairs of Keane, and are in possession of private corporate information concerning Keane's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Keane which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits.

127.     By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

128.     As a result of the actions of defendants, plaintiff and the Class will suffer irreparable injury as a result of defendants' self-dealing.

129.    Unless enjoined by this Court, the defendants named herein will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the proposed Acquisition which will exclude the Class from its fair share of Keane's valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Class, as aforesaid.

130.    Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class and have breached and are breaching their fiduciary duties to the members of the Class.

131.    Unless the proposed Acquisition is enjoined by the Court, the defendants named in this claim will continue to breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Acquisition terms, and will not supply to Keane's stockholders sufficient information to enable them to cast informed votes on the proposed Acquisition and may consummate the proposed Acquisition, all to the irreparable harm of the members of the Class.

132.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

### Derivatively for Violations of §14(a) of the Exchange Act
### Against All Defendants

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances

under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

135.    The Company's 1995-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the defendants were causing Keane to engage in an option backdating scheme, a fact which defendants were aware of and participated in from at least 1995.

136.    In the exercise of reasonable care, defendants should have known that the Proxy Statements were materially false and misleading.

137.    The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

138.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Derivatively for Accounting

139.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.    At all relevant times, the defendants, as directors and/or officers of Keane, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

141.    In breach of their fiduciary duties owed to Keane and its shareholders, the defendants caused Keane, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Keane and/or failed to properly investigate whether these grants had been improperly made.  By this wrongdoing, the defendants breached their fiduciary duties owed to Keane and its shareholders.

142.    The defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the defendants.

143.    As a result of defendants' misconduct, Keane has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

144.    Plaintiff demands an accounting be made of all stock options grants made to any of the defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of the defendants, as well as the disposition of any proceeds received by any of the defendants via sale or other exercise of backdated stock option grants received by those defendants.

## COUNT IV

### Derivatively for Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    Each of the defendants agreed to and did participate with the others and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties the defendants owed to the Company.

147.    The defendants have violated fiduciary duties of care, loyalty, candor and independence owed to Keane and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Keane and its shareholders.

148.    As demonstrated by the allegations above, defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Keane and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding defendants' option backdating scheme.

149.    By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Keane and its public shareholders.

150.    As a proximate result of defendants' conduct, in concert with each other, Keane has been injured and is entitled to damages.

## COUNT V

### Derivatively for Abuse of Control Against All Defendants

151.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.    The defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Keane, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at Keane.  As a part of this scheme, defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding Keane.

153.    Defendants' conduct constituted an abuse of their ability to control and influence Keane.

154.     By reason of the foregoing, Keane has been damaged.

**COUNT VI**

**Derivatively for Gross Mismanagement Against All Defendants**

155.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.     Defendants had a duty to Keane and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Keane.

157.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Keane in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, defendants breached their duties of due care, diligence and candor in the management and administration of Keane's affairs and in the use and preservation of Keane's assets.

158.     During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused Keane to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Keane, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged Keane.

159.     By reason of the foregoing, Keane has been damaged.

**COUNT VII**

**Derivatively for Constructive Fraud Against All Defendants**

160.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    As corporate fiduciaries, defendants owed to Keane and its shareholders a duty of candor and full accurate disclosure regarding the true state of Keane's business and assets and their conduct with regard thereto.

162.    As a result of the conduct complained of, defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Keane's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Keane.  Thus they have committed constructive fraud and violated their duty of candor.

163.    By reason of the foregoing, Keane has been damaged.

## COUNT VIII

### Derivatively for Corporate Waste Against All Defendants

164.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

165.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to defendants via the option backdating scheme, defendants have caused Keane to waste valuable corporate assets.

166.    As a result of defendants' corporate waste, they are liable to the Company.

## COUNT IX

### Derivatively for Unjust Enrichment Against All Defendants

167.    Plaintiff incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

168.    As a result of the conduct described above, defendants will be and have been unjustly enriched at the expense of Keane, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

169.    All the payments and benefits provided to the defendants were at the expense of Keane.  The Company received no benefit from these payments.  Keane was damaged by such payments.

170.    Certain of the defendants sold Keane stock for a profit during the period of deception, misusing confidential non-public corporate information.  These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Keane.  A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT X

### Derivatively Against the Officer Defendants for Rescission

171.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

172.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and Keane entered into during the relevant period were obtained through defendants' fraud, deceit and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by Keane shareholders and filed with the SEC.

173.    All contracts which provide for stock option grants between the Officer Defendants and Keane and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

**COUNT XI**

**Derivatively Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Keane common stock on the basis of such information.

176.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Keane common stock.

177.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Keane common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

178.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows and, to the extent the damages relate to the Class Claim, plaintiff demands preliminary and permanent injunctive relief in his favor and in favor of the Class and against defendants as follows:

A.    Declaring that this action is properly maintainable as a class action;

B.    Declaring that this action is also properly maintainable as a derivative action;

C.      Declaring and decreeing that the Acquisition agreement was entered into in breach of the fiduciary duties of the defendants and is therefore unlawful and unenforceable;

D.      Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

E.      Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

F.      Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for shareholders;

G.      Directing the Director Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Keane's shareholders;

H.      Imposing a constructive trust, in favor of plaintiff, upon any benefits improperly received by defendants as a result of their wrongful conduct, including all improper stock option grants which vest upon the change in control of the Company;

I.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

J.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February _14_, 2007

SHAPIRO HABER & URMY LLP
THOMAS G. SHAPIRO (BBO#454680)
ADAM M. STEWART (BBO#661090)


THOMAS G. SHAPIRO

53 State Street
Boston, MA  02109
Telephone:  617/439-3939
617/439-0134 (fax)

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ADEMI & O'REILLY, LLP
GURI ADEMI
SHPETIM ADEMI
3620 East Layton Avenue
Cudahy, WI  53110
Telephone:  414/482-8000
414/482-8001 (fax)

Attorneys for Plaintiff

S:\CptDraft\Deal\Cpt Keane Deal Derv Fed.doc

## VERIFICATION

I, RANDALL J. BARON, hereby declare as follows:

1.      I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, counsel for plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this __ 3 __ day of February, 2007 at San Diego, California.

_____
RANDALL J. BARON